# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**William James Bumpus,**
**Petitioner Below, Petitioner**

**vs.) No. 19-0909** (Kanawha County 19-P-7)

**R.S. Mutter, Superintendent,**
**McDowell County Correctional Center,**
**Respondent Below, Respondent**

**FILED**

**September 4, 2020**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner William James Bumpus, by counsel Evan Olds and Drannon Adkins, appeals the Circuit Court of Kanawha County's September 3, 2019, order that denied his petition for a writ of habeas corpus. Respondent R.S. Mutter, Superintendent, McDowell County Correctional Center, by counsel Mary Beth Niday, filed a response in support of the circuit court's order. Petitioner submitted a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

Near midnight on July 6, 2006, petitioner, who was then sixteen years old, and co-defendants Ronald Hambleton and Daniel Botkin, also juveniles, were riding around Charleston, West Virginia, when they encountered Joshua Boggess ("the victim") walking on the ground level of the BB&T parking garage located on Lee Street, East.[1] Petitioner, Hambleton, and Botkin got out of the car. Petitioner asked the victim what time it was and demanded that the victim give him his money. The victim approached petitioner, who then shot him one time in the chest with a .22 caliber handgun, killing him. Petitioner threw the handgun into the bushes[2] and, along with his co-

---

[1] Also in the vehicle were the driver, Forrest Carter, and two female passengers.

[2] Police later recovered the handgun from the bushes near the bank parking garage.

1

defendants and the others, fled the scene in the vehicle. Petitioner was dropped off at his home. The driver, Forrest Carter, called 9-1-1.

Police interviewed Carter at 1:20 a.m. on July 7. The two female passengers were also questioned. At 3:52 am, police went to petitioner's home to execute a search warrant. They picked up petitioner and drove him to the police station at 4:15 a.m. At 4:26 a.m., petitioner was advised that he was under arrest and was read his *Miranda* rights[3] from the Juvenile Interview and Miranda Rights Form. The waiver form indicated that petitioner was under arrest for "shooting murder." Petitioner initialed and signed the waiver form and gave an audio/video statement to police in which he admitted to shooting the victim with a .22 caliber handgun that he had in the front waistband of his pants. At 5:20 a.m., police escorted petitioner to magistrate court for a juvenile detention hearing. He was ordered to be detained and transported to a juvenile detention facility. Approximately eleven hours later, police arrested petitioner's co-defendants, Hambleton and Botkin, who gave statements that were similar to petitioner's.

On July 20, 2006, the State filed a motion to transfer petitioner to the criminal jurisdiction of the Circuit Court of Kanawha County with respect to the charge of first-degree murder, as it was a transferable offense pursuant to West Virginia Code § 49-5-10(d)(1) [2015].[4] Petitioner's appointed counsel, John Sullivan, did not file a written reply to the motion. However, at the omnibus hearing in the present habeas matter, trial counsel testified that he contested transfer at the transfer hearing.[5] By order entered on August 14, 2006, the circuit court granted the motion to transfer, finding that there was probable cause to believe that petitioner committed the crime of first-degree murder and that, having so found, it had a mandatory duty to transfer the proceeding to the criminal jurisdiction of the court under West Virginia Code § 49-5-10(d)(1).

Petitioner was thereafter indicted on one count of first-degree murder by the use of a firearm and one count of attempted first-degree robbery by the use of a firearm. Petitioner pled not guilty and a trial date was set for December 4, 2006.

On November 21, 2006, petitioner filed a motion to suppress his statement to police on the ground that law enforcement failed to fully inform him of the charge for which he had been arrested

---

[3]  *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] West Virginia Code § 49-5-10(d)(1), which was in effect at the time of petitioner's crimes but which has since been recodified, provided, in relevant part, as follows:

> (d) The court shall transfer a juvenile proceeding to criminal jurisdiction if there is probable cause to believe that:
>
> (1) The juvenile is at least fourteen years of age and has committed . . . the crime of murder under sections one, two and three, article two of [chapter sixty-one of this code] . . . .

[5] The parties agree that the transcripts of both the transfer and plea hearings could not be located, a fact acknowledged by the circuit court at the omnibus hearing.

– that is, that, prior to obtaining petitioner's confession, "[t]he police intentionally deceived [him] by failing to inform him that the victim had died." He argued further that his statement was not made in accordance with the prompt presentment statutes, *see* W. Va. Code §§ 49-5-8 and 62-1-5, and that the police improperly used the fact that petitioner's mother had recently died in order to obtain his confession. Petitioner argued that, for these reasons, he did not make a knowing, intelligent, and voluntary waiver of his *Miranda* rights, and that his statement was involuntary and inadmissible.

Petitioner also filed a motion in limine to preclude the introduction of the statements given by petitioner's co-defendants on the ground that they were inadmissible hearsay. Finally, petitioner filed a motion to dismiss count two of the indictment (attempted robbery in the first degree) on the ground that the circuit court lacked jurisdiction over that charge because the juvenile petition charged petitioner with only murder and that the motion to transfer and resulting transfer order similarly referred only to the murder charge. Petitioner also argued that a prosecution for robbery in this case violated principles of double jeopardy.[6]

On November 16, 2006, the State tendered a plea offer to petitioner. Petitioner subsequently agreed to plead guilty to first-degree murder and first-degree robbery. In return, the State agreed to recommend a sentence of life in prison, with mercy, on the murder charge, and forty years on the robbery charge, with such sentences to run concurrently. Petitioner signed a statement in support of the guilty plea and, similarly, his trial counsel completed a statement in support of the plea. Following a hearing, the circuit court accepted petitioner's guilty pleas by order entered on November 30, 2006.

A sentencing hearing was conducted on February 15, 2007. By order entered on February 20, 2007, petitioner was found guilty of murder in the first degree and first-degree robbery and was sentenced consistent with the plea agreement described above. A hearing to reconsider petitioner's sentence upon his eighteenth birthday was conducted on February 29, 2008. Petitioner's sentence was unaltered.

On January 3, 2019, petitioner filed a petition for a writ of habeas corpus. An omnibus evidentiary hearing was conducted on April 18, 2019, at which time petitioner, while represented by present counsel, relied on the *Losh* list[7] and waived certain grounds. In support of his petition, petitioner alleged the following grounds: petitioner's confession was invalid because it was elicited in violation of the prompt presentment statute and was involuntarily given under the totality of the circumstances; the trial court lacked jurisdiction to transfer petitioner to adult status; petitioner's guilty plea was involuntary; petitioner's conviction of first-degree robbery violated double jeopardy principles; petitioner received ineffective assistance of counsel; and cumulative error.

The circuit court denied petitioner's request for habeas relief by order entered on

---

[6] Given petitioner's subsequent guilty plea, the circuit court never ruled on petitioner's motions.

[7] *Losh v. McKenzie,* 166 W. Va. 762, 277 S.E.2d 606 (1981).

September 3, 2019. In its detailed, fifty-three page order, the court specifically found that petitioner's confession was not coerced, was voluntarily made after he was given *Miranda* warnings, and was not obtained in violation of the prompt presentment statute; that there was probable cause to believe that petitioner committed first-degree murder and, in such case, transfer was mandatory; that there was no error in the transfer proceeding; that the trial court had jurisdiction to accept petitioner's plea; that petitioner's plea was voluntary; that there was no violation of double jeopardy principles; that trial counsel was not ineffective; and that, because there was no prejudicial error, there was no cumulative error.[8] It is from this order that petitioner now appeals.

> In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Mathena v. Haines*, 219 W. Va. 417, 633 S.E.2d 771 (2006).

On appeal, petitioner argues the following: that the circuit court erred in finding that the prompt presentment statute was not violated; that petitioner's waiver and confession were not voluntarily, knowingly, or intelligently given; that the circuit court lacked jurisdiction to transfer petitioner to adult status; that petitioner's guilty plea was not voluntary; that petitioner's sentence violated double jeopardy principles; that trial counsel was ineffective; and that the cumulative error doctrine demands that habeas relief be granted.[9]

Upon our review and consideration of the circuit court's fifty-three page order denying petitioner's request for habeas relief, the parties' arguments, and the record on appeal, we find no error or abuse of discretion by the circuit court. Indeed, the record clearly supports the circuit court's detailed order denying the requested relief based upon the errors alleged on appeal, which were also argued below. Accordingly, we hereby adopt and incorporate the circuit court's well-reasoned findings and conclusions as they relate to petitioner's assignments of error raised herein and direct the Clerk to attach a copy of the court's September 3, 2019, final order denying

---

[8] Though petitioner also asserted that he lacked mental competency at the time of the crime and at the time of trial, that his sentence was excessive or more severe than expected, and that prejudicial statements were made by the judge and the prosecutor, the circuit court specifically found in its order denying habeas relief that petitioner failed to present any evidence in connection with these claims. As a result, the court deemed these alleged errors to have been abandoned. Petitioner does not challenge this finding in this appeal.

[9] Additionally, petitioner assigns as error the circuit court's conclusion that, although a violation of the prompt presentment statute "may render a confession inadmissible, [it] does not violate any constitutional right." Given our conclusion that the court did not err in finding that the prompt presentment statute was not violated in this case, we need not address this assignment of error.

4

petitioner's request for habeas relief, entitled "Final Order with Findings of Fact and Conclusions of Law," to this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** September 4, 2020

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison

5

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA ex rel.
WILLIAM JAMES BUMPUS,
    Petitioner,

v.

                              Civil Action No. 19-P-7
                              Criminal Action No. 06-F-353
                              Judge Louis H. Bloom

RALPH TERRY, WARDEN,
STEVENS CORRECTIONAL CENTER,
    Respondent.

## FINAL ORDER WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pending before the Court is a *Petition for Writ of Habeas Corpus* filed on January 3, 2019, by the Petitioner, William James Bumpus, by counsel, Evan S. Olds. Following a review of the underlying criminal file, the *Losh* list, the *Petition* and accompanying memorandum of law, the response to the petition filed by the Respondent Warden, the testimony at the omnibus evidentiary hearing, and the pertinent law, the Court makes the following findings of fact and conclusions of law with discussion and final order. The Court FINDS that Petitioner has not met his burden as to any evidentiary ground and ORDERS that the *Petition for Writ of Habeas Corpus* be DENIED.

The Court acknowledges that transcripts for the transfer and dispositional hearings do not exist. However, the burden remains upon Petitioner to prove his contentions by evidence of record and not by mere speculation. The Court FINDS sufficient evidence in the record to detennine that there exists no error of a constitutional dimension nor provable prejudice arising from Petitioner's transfer hearing and guilty plea. Additionally, sufficient evidence exists to determine that Petitioner's trial counsel was not ineffective.

1

# FINDINGS OF FACT

1. Petitioner shot and killed Joshua Boggess on July 6, 2006. The victim was killed in a BB&T parking garage at Lee and Court Streets in Charleston> Kanawha County, West Virginia. [1] A witness was in a car with Petitioner and his two codefendants (as well as others). There was a gun in the car. Petitioner and his codefendants, Ronald Hambleton and Daniel Botkin> saw a white male walking in the parking garage. They exited the car and Petitioner pointed a gun at the victim. When the three got back in the car Petitioner stated he shot the victim. [2]

2. Each of the three codefendants gave statements to the police. Petitioner's statement is contained in the exhibits and also in supplemental discovery provided to trial counsel. The statements of Petitioner's codefendants, Botkin and Hambleton, are also in the underlying criminal file.

3. Petitioner's statement began at 4:26 a.m. on July 7, 2006. [3]

4. The opening lines of the waiver indicate that Petitioner is under arrest for "shooting murder." Before the statement began, the police explained that Petitioner had rights regarding the statement and that the police would make sure he understood his rights before they spoke. [4]

5. The police read each of the rights to Petitioner and asked Petitioner to sign his name if he understood the rights. The rights and Petitioner's confirmation that he understood them occurred before the police addressed waiver of those rights, at about 4:30 a.m. [5]

6. The police read the waiver to Petitioner and Petitioner agreed to make a statement, signing the written waiver. [6]

---

[1] Exhibit 26.
[2] *Id*
[3] Petitioner's Statement, Exhibit 6 at I.
[4] *Id* at 2.
[5] *Id*
[6] *Jd.*

7. Petitioner said, "[d]on't have-I ain't got to answer do I?" The police said no, that he did not need to answer any of their questions. Petitioner could say anything or as little as he pleased; that decision belonged entirely to Petitioner.[7]

8. Petitioner stated that he asked "him" what time it was, and the victim called Petitioner the "N-word." Petitioner had the gun out when the victim approached him; Petitioner got scared and pulled the trigger.[8]

9. Petitioner stated he had found the gun and was carrying it for protection.[9]

10. Petitioner denied that it was his intention to rob the victim.[10]

11. The police told Petitioner that the victim had died.[11]

12. The police did reference Petitioner's mother, but only to acknowledge that she was dead and that Petitioner's home life was difficult.[12]

13. Petitioner then stated that it was Botkin's idea to rob the victim, and that both Hambleton and Botkin exited the car with Petitioner.[13]

14. After the shooting, the defendants drove to Farnsworth Drive where Botkin and Hambleton got out; Petitioner went to his home.[14]

15. Petitioner was offered a drink by the police. The police left the interview room at 4:49 a.m. and returned at 5:01 a.m.[15]

---

[7] *Id.* at 2.
[8] *Id.* at 3.
[9] *Id* at 4.
[10] *Id.* at 5.
[11] *Id.* at 6.
[12] *Id.*
[13] *Id.* at 6-7.
[14] *Id.* at 9.
[15] *Id.* at 10.

16. Petitioner reiterated that the victim came toward him first, but that was all he wanted to say at that time. [16]

17. The officers then explained he would be taken across the street for a detention hearing. He was warned that he most likely would be detained. The police also stated that an attorney would be appointed to represent him and that he should listen to that attorney. This exchange concluded the statement, which in total lasted 23 minutes.

18. Botkin, after being Mirandized, waived his rights and gave a statement. [17]

19. Botkin stated that the defendants were driving around when Petitioner suggested they rob someone. Botkin claimed Petitioner had the gun. They exited the car, and Petitioner told the victim to give him his money. The victim ran toward Petitioner and Petitioner fired the gun. Botkin ran away. [18]

20. Botkin noted that "Forrest" was driving the car. After picking Petitioner up, they drove around for a while, going by the bank, which is when the idea of the robbery came up. [19]

21. They saw the victim crossing the street at Chili's. Botkin described Petitioner demanding the money and how the victim resisted and first approached Petitioner, then retreated. According to Botkin, the victim was shot as he retreated.[20]

22. Hambleton also gave a statement after waiving his rights. Both Botkin and Hambleton were interviewed some twelve hours after Petitioner's statement.[21]

23. Hambleton had an adult present during his questioning.[22]

---

[16] id.
[11] Botkin statement, contained in discovery, at I.
[18] id at 2.
[19] id. at 3-4.
[20] id at 5.
[21] Hambleton statement, contained in discovery, at 1-2.
[22] id. at 2.

4

24. Hambleton stated they were riding around in a car.[23] He denied that he participated in the robbery but stated that Botkin and Petitioner robbed the victim, and that Botkin told him (Hambleton) that Petitioner shot the victim.[24]

25. Hambleton stated that others must have participated in the robbery with Botkin and Petitioner.[25]

26. Hambleton then stated that, in fact, the robbery had been discussed in the car.[26]

27. He then stated he was in the street, not far from where the robbery occurred, but reiterated that he did not participate.[27]

28. Hambleton, however, when informed that Botkin had been arrested, admitted that he (Hambleton) pushed the victim away from Petitioner, trying to look out for his "buddy."[28]

29. According to the Charleston Police Department Investigative Report,[29] the murder occurred at approximately 11:50 p.rn. on July 6, 2006. The report notes that Petitioner, Hambleton, and Botkin were riding around in a car driven by Forest Carter with two girls, Freda Gilmore and Cassandra Pierce, also in the car.[30]

30. Petitioner and his codefendants exited the car and approached the victim. Petitioner asked the victim what time it was, then pulled out a handgun and demanded money. The victim resisted by hitting Petitioner; in return, Hambleton struck the victim. Petitioner then shot and killed the victim. Petitioner and his codefendants all fled the scene.[31]

---

[23] *Id.* at 2-3.
[24] *Id.* at 8.
[25] *Id* at 7.
[26] *Id.* at 12.
[27] *Id* at 13.
[28] *Id* at 14.
[29] Exhibit 3.
[30] *Id* at 2.
[31] *Id.*

5

31. The driver, Forrest Carter, called 911. TI1e driver was interviewed at I :20 a.m. on July 7. Pierce and Gilmore, the two girls in the car, also were brought in for questioning.[32]

32. Carter told police that everyone was in the car when they saw the victim, and a comment was made to jump him. Carter stayed in the car. The other three males got out and approached the victim. Carter heard a single gunshot, then the males got back in the car and Carter drove away.[33]

33. At about 3:52 a.m. on July 7, the police went to Petitioner's home. Petitioner's father said Petitioner was not home. However, the father eventually called for Petitioner to come upstairs. Police and Petitioner went to the police station at 4:15 a.m.[34]

34. Petitioner's statement began at 4:26 a.m. Petitioner was infonned he was under arrest, read his Juvenile Miranda Rights, signed the waiver thereof, and confessed.[35]

35. After the brief statement, Petitioner was booked, processed, and taken to magistrate court at 5:20 a.m.[36]

36. The witness statements indicate that both Pierce and Gilmore stated they were with the codefendants and heard each of them make incriminating statements about the murder.[37]

37. Several civilian witnesses heard a gunshot and saw people fleeing and entering a car. Two witnesses said they found the victim lying on the ground, coughing, indicating that the victim did not die immediately.[38]

---

[32] *ld* at 4.
[33] *id.*
[34] *Id.* at *5.*
[35] See above statement; *Id.* at 6.
[36] *Jd.*
[37] *Id* at 12.
[38] *Id.* at 12-14.

6

38. Petitioner, as noted, signed a written waiver form, one specifically designed for juveniles. Petitioner was born in February 1990 and was thus sixteen years old at the time he was questioned. He was informed that he was under arrest for a shooting murder.[39]

39. He acknowledged that he could read, write, and understand English, and further acknowledged that he understood each of his rights. He signed the rights form, signifying he understood them, and signed the waiver. This all occurred before questioning started.[40]

40. Petitioner was charged in a juvenile petition with the offense of first-degree murder.[41] FoIJowing a detention hearing, Petitioner was ordered detained. The magistrate found that he had committed an act which would be a crime if committed by an adult.[42] That act was first-degree murder, and that offense is detainable.[43]

41. The State filed a motion to have Petitioner transferred to adult status, and the Court ordered that a transfer hearing be held. As pertinent to these proceedings, defense counsel, John Sullivan, filed a motion to suppress statements and a motion to prevent testimonial hearsay. Those same or substantially similar motions were filed after the motion to transfer was granted. The transfer hearing was held and an order granting the transfer was entered August 14, 2006.[44]

42. That order stated that the evidence before the Court consisted of statements from both Charleston Police Detective Eggleton and the medical examiner, as well as audio/video statement of Petitioner.[45]

---

[39] Exhibit 5.
[40] *Jd.*
[41] Exhibit 1.
[42] *Jd.* at 2.
[43] *Id.* at 3.
[44] Exhibit I0, as corrected.
[45] *Id.* at UMumbered page 1.

43. The Court found there to be probable cause to believe that Petitioner participated in an attempted first-degree robbery of the victim.[46]

44. The victim was shot once in the chest. The medical examiner testified that, to a reasonable degree of medfoal certainty, the gunshot caused the victim's death.[47]

45. The offense occurred at the BB & T parking garage.[48]

46. Petitioner was 16 years old at the time of the offense.[49]

47. The Court found that Petitioner's statement was voluntarily given, that the police followed all appropriate legal procedures, and that Petitioner knO\v.ingly and intelligently waived his rights prior to the interrogation.[50]

48. Petitioner's admissions were consistent with the physical evidence.[51]

49. Petitioner admitted that he was in a car with other juveniles when one of the other juveniles suggested robbery.[52]

50. When the victim was spotted, another juvenile said, "let's get him," and Petitioner along with the two other juveniles got out of the car and approached the victim.[53]

51. Petitioner admitted having a gun during this interaction. He further admitted that during the attempted robbery he shot the victim.[54]

52. He admitted throwing the gun away in the bushes, where the Charleston Police Department found a gun.[55]

---

[46] *Id*
[47] *Id*
[48] *Id*. at unnumbered page 2.
[49] *Id.*
[50] *Jd.*
[51] *Id.*
[52] *Id.*
[53] *Id*. at unnumbered pages 2-3.
[54] *Id* at unnumbered page 3.
[55] *Id.*

53. The Court conc]uded, as a matter of law, that Petitioner's statement was admissible because it was properly taken by police detectives. The Court concluded that there was probable cause to believe Petitioner committed the offense of first-degree murder.[56]

54. Having found probable cause that Petitioner committed first-degree murder, transfer of Petitioner to adult status was mandatory.[57]

55. Following transfer, Petitioner's case was presented to the grand jury.[58]

56. The case was presented as, and the grand jury returned, a two-count indictment charging first-degree murder with a firearm and attempted first-degree robbery with a firearm.[59]

57. Detective Kinnard testified to the grand jury that Petitioner was in a car with his codefendants and others. The victim was walking across the parking garage. Petitioner got out of the car with Hambleton and Botkin and approached the victim. Petitioner asked what time it was, then demanded money from the victim while pulling a gun from his waistband.[60]

58. The victim resisted and hit Petitioner in the face, which prompted a co-defendant to strike the victim. Petitioner then killed the victim with one gunshot to the heart.[61]

59. The detective informed the grand jury that Petitioner was informed of his Miranda Rights and confessed to the offense.[62]

60. The assistant prosecutor noted that the death would falJ under the felony murder rule.[63]

61. The assistant prosecutor also asked the detective if the defendants feloniously, willfully, maliciously, deliberately, and unlawfully did slay, kill, and murder the vfotim with a firearm; and

---

[56] *Id*
[57] *Id* at unnumbered page 4.
[58] Exhibit 11, Transcript of proceedings, September 26, 2006.
[59] Exhibit 12.
[60] Exhibit 11 at 5.
[61] *Id* at 5-6.
[62] Id. at 8.
[63] Id. at 10.

if he used the firearm in an attempt to steal property from the victim against his will. The assistant prosecutor then noted that robbery and attempted robbery also support felony murder.[64]

62. Therefore, a fair inference of the presentation is that the State presented theories of both felony murder and premeditated murder (which is pennissible) as well as the supporting offense of attempted robbery to the grand jury.

63. After Petitioner was arraigned, each side requested discovery and filed motions and responses. Relevant to these proceedings, trial counsel filed motions which appear to be the same or substantially similar to the ones filed before the transfer hearing. Additionally, the State responded to those motions.

64. Petitioner filed a motion to suppress his statement.[65] As grounds for suppression, Petitioner alleged deception by the police by not informing him the victim had died. He also challenged the voluntariness of the statement, alleging it was taken in violation of the prompt present rule and that police had manipulated Petitioner by referencing the death of his mother.

65. Counsel also asked the Court to prohibit the introduction of the codefendants' statements.[66] Trial counsel additionally moved the Court to dismiss the robbery count.[67] This motion noted that Petitioner initially was not charged with robbery and that the transfer hearing and subsequent order implicated only the murder. Additionally, Petitioner noted his belief that a prosecution for both robbery and murder implicated double jeopardy.

---

[64] Id. at 11-12.
[65] Exhibit 14.
[66] Exhibit 15.
[67] Exhibit J6.

10

66. The State's response in the criminal case noted that the codefendants had signed plea agreements to the offenses of second-degree murder and robbery, with recommendations of forty years to run concurrently on each charge.[68] Therefore, the testimonial issue was moot.

67. As to the possible suppression of Petitioner's own statement, the State's response pointed out that Petitioner was arrested for a shooting, and that the victim subsequently had passed away. Additionally, before any statement was made, the Juvenile Miranda form clearly stated that Petitioner was under arrest for "shooting murder."

68. As to the motion to dismiss the robbery count, the State denied that the transfer order addressed only the murder, as there were multiple references therein to the attempted robbery. The case was transferred to adult status as a felony murder, with attempted robbery being the wlderlying felony. The State argued that at trial the robbery would merge with the murder and the State could proceed to try Petitioner for first-degree murder, felony murder, and attempted robbery.

69. Ultimately, the issues of evidence at trial, suppression of statements, and all other issues were rendered irrelevant by Petitioner's entry of a knowing, voluntary, and intelligent guilty plea.

70. Petitioner signed and completed several documents pertinent to his guilty plea. Those enable this Court to make a factual determination that Petitioner's plea was knowing, voluntary, and intelligent with a full understanding of his constitutional rights and the consequences both of waiving those rights and of the plea itself.

71. The plea letter details that the Defendant may plead guilty to first-degree murder and additionally plead guilty to first-degree robbery. Petitioner was to lay the factual basis for the plea. The State agreed to recommend mercy on the murder charge and a concurrent tenn of forty years for the robbery. The letter is dated November 16, 2006. Petitioner signed it on November 30.[69]

---

[68] Exhibit 17.
[69] Exhibit 18.

11

72. Petitioner signed written pleas of guilty. The murder guilty plea is Exhibit 19, which details that Petitioner acknowledges that he fully understood the following rights: the right to an attorney; the right to consult th that attorney and prepare a defense; the right to a public. trial with an impartial jury and that by pleading guilty he would not receive a trial; the right to remain silent; the right to confront and cross-examine his accusers; the right to testify in his own defense and present witnesses on his own behalf; the right to appeal if he were convicted by a jury; and the right to move the Court to suppress illegally obtained evidence and confessions. The plea further demonstrated Petitioner's understanding that by pleading guilty he waived all pre-trial defects with regard to, among others, his arrest, the gathering of evidence, and prior confession, as well as all non-jurisdictional defects.[70]

73. Petitioner acknowledged he had read and understood all of his rights. By signing the plea, he acknowledged that he was satisfied with the representation by his lawyer who had fully explained the charges.[71]

74. Petitioner signed a statement in support of the guilty plea.[72] He was 16 years old and in the eleventh grade, having completed 10 years of schooling. He understood he had the right to a lawyer, either one he hired or one appointed to represent him. He understood the elements of the offenses to include that he killed the victim during the commission of the robbery with the use of a firearm. He understood the maximwn penalties for the offenses.

75. He averred that he had never been treated for mental illness and was not addicted to drugs. He was not under the influence when he filled out the statement. He had discussed the plea with his father.[73]

---

[70] Exhibit 19 at 1-2.
[71] *Id*. at 2-3.
[72] Exhibit 20.
[13] *Jd.*

12

76. Petitioner had discussed with his lawyer every fact and circwnstance about the case, having told his lawyer everything about the case.[74]

77. He acknowledged that the decision to plead guilty was his and his alone, regardless of what his lawyer had told him. He understood the plea, had signed it freely and voluntarily, and was promised nothing in exchange for his plea.[75]

78. Petitioner understood he had a constitutional right to plead not guilty. He understood his right to a public trial at which he could not be compelled to testify. He knew he could confront and cross-examine his accusers and had the right to compel witnesses on his behalf. Petitioner acknowledged that at trial the State would have to prove his guilt beyond a reasonable doubt. He understood that after a trial he had the right to appeal his conviction.[76]

79. Petitioner understood his right to move to suppress statements and illegally obtained evidence, but that by pleading guilty he waived all relevant provisions of law and constitutional rights. He was satisfied with his Jawyer and pleaded guilty of his own free will and believed himse]f to be guilty.[77]

80. Trial counsel completed an attorney's statement in support of the plea.[78] Counsel had ample opportunity to prepare any possible defenses and had met with his client conceming the case and possib1e defenses. Trial counsel had explained every element of the charges in the indictment. He had explained Petitioner's constitutional rights surrendered by a guilty plea and had explained the consequences of the plea.[79]

---

[74] *Id.*
[75] *Id.*
[76] *Jd.*
[77] *Id.*
[78] Exhibit 21.
[79] *Id.*

13

81. Counsel believed that his client understood the elements of the crime. Counsel had investigated the charges. The State had sufficient admissible evidence to support a guilty plea. Counsel had discussed the State's disclosure with his client and had gone over the defendant's statement in support of guilty plea with Petitioner. Petitioner wrote all answers for himself save for Counsel writing the answer to question 10. Petitioner had reread the questions and answers after they were completed.[so]

82. Further, Petitioner completed the two-page rights waived by guilty plea form which enumerated all rights attendant to a jury trial. Petitioner initialed each and every right, indicating he knew the rights he had and was giving up by pleading guilty.

83. The Court entered an Order accepting the guilty pleas.[81] In that Order, the Court found Petitioner to be represented by competent counsel with whom he was completely satisfied regarding representation and advice. He had been advised by his lawyer with respect to his constitutional rights and his waiver. Petitioner understood the meaning of the charges.[82]

84. The Court found that Petitioner had knowingly and intelligently waived his constitutional rights and that he freely, voluntarily, intelligently, knowingly, and understandingly pleaded guilty to both counts of the indictment.[83]

85. A presentence report had been prepared. At disposition, his counsel noted that Petitioner was housed in a juvenile facility until he was 18 years old and did ask for mercy.[s4] Petitioner apologized.[85] Petitioner was sentenced in accordance with the plea agreement.[&6]

---

[110] *Id.*
[111] Exhibit 22.
[82] *Id.*
[s3] *Id.*
[84] Disposition Transcript, February 15, 2007, at 2-4.

[86] *Id.* at 13.

14

[85] *Id* at 4.

[86] *Id.* at 13.

86. When he turned 18 years old, Petitioner was resentenced in accord with the plea.[87]

87. With the assistance of counsel, Petitioner has filed a petition for writ of habeas corpus.

88. An omnibus evidentiary hearing was held on April 18, 2019. Both Petitioner and his trial counsel testified during the hearing.

89. Before testifying, Petitioner was placed under oath and acknowledged his understanding that the instant proceeding was, essentially, his one and only opportunity at a post-conviction proceeding and that every ground not raised was waived for the purposes of further proceedings in both state and federal court. Counsel for Petitioner reviewed the *Losh* list with his client.[88] Petitioner remembered reviewing the list with habeas counsel.[89] He acknowledged that he initialed the grounds he wished to assert and initialed those he wished to waive.[90] Counsel had gone over every ground with him and explained that any grounds waived could never be asserted again. Petitioner had the opportunity to ask questions about the grounds, and his counsel answered those questions.[91] Certain grounds could not be asserted because of the way the underlying criminal matter proceeded.[92] Petitioner was not forced in any way to sign the *Losh* list.[93] The Court clarified that Petitioner was raising the following grounds: trial court lacked jurisdiction, involuntary guilty plea, mental competency at the time of crime, mental competency at time of trial, unintelligent waiver of counsel, failure of counsel to take an appeal, coerced confession, ineffective assistance of counsel, double jeopardy, irregularities in arrest, constitutional errors in evidentiary rulings, claims of prejudicial statements by the judge and by the prosecutor, severer

---

[87] Exhibit 24.
[88] Omnibus hearing transcript at 4.
[89] *Id.* at 6.
[90] *Id.* at 7.
[91] *Jd.*
[92] *Jd*
[93] *Id.* at 8.

sentence than expected, excessive sentence, illegal detention, and cumulative error.[94] The Court will note that no evidence was presented as to irregularities in arrest or as to claims of prejudicial statements by the judge or by the prosecutor, and deems those claims to be abandoned.

90. Additionally, Petitioner acknowledged that by raising the issue of ineffective assistance of counsel, he was waiving the privilege of confidential communications with his trial attorney.[95]

91. Petitioner testified that he was 16 years old when he committed the crime.[96]

92. He had no history of juvenile offenses.[97]

93. On June 17, 2006, his mother passed away.[98]

94. After the murder, Petitioner was arrested at his residence.[99]

95. Petitioner did not remember the police having a warrant for his arrest. He was placed in handcuffs at his home and told he was under arrest and driven a short distance to the police station.[100] He was not questioned during the drive.[101]

96. Petitioner was placed in a holding cell and later fingerprinted.[102] Petitioner believed that he was questioned for about an hour. At the omnibus hearing, he testified that he did not really understand his rights.[103]

97. Petitioner was afforded a detention hearing for which an attorney represented him.[104]

98. Petitioner had telephone contact and in-person meetings with his lawyer while in detention before trial. He stated he met only twice with his attorney at the detention center.[105] His

[94] *Id* at 8-10.
[95] *Id.* at 11.
[95] *Id.* at 12.
[97] *Id.* at 13.
[98] *Id*
[99] *Id*
[100] *Id.*
[101] *Id.* at 15.
[102] *id.* at 16.
[103] *Id.* at 18-19.
[104] *Id.* at 20.
[105] *Id.* at 21

attorney initiated all calls, Petitioner never tried to call his attorney. [106] He also never wrote a letter to his attorney. [107]

99. Petitioner stated he mostly discussed obtaining a plea agreement with his attorney, but they did discuss going to triaJ. However, the decision was made by Petitioner and Counsel that going to trial was a bad idea because it carried the possibility of a sentence of life without parole.[108]

100. Trial counsel did discuss with Petitioner the evidence the State had against him.[109]

101. Petitioner testified at the omnibus hearing that he felt "rushed" to sign the plea offer. However, during the plea hearing he had no questions about the actual terms of the plea offer.[110]

102. He could not recall how much time he had to consider the State's plea offer. [111]

103. His lawyer promised nothing and did not make threats in order to induce Petitioner's signature on the plea agreement. Petitioner understood what he was pleading to "at the time."[112]

104. Petitioner professed not to recall signing any of the plea paperwork and professed not to recall anything that happened during the plea. [113]

105. Petitioner did not request that his attorney file an appeal. [114]

I06. He never asked trial counsel to file any documents or pleadings on his behalf. [115]

107. Petitioner acknowledged sjgning every page of the defendant's statement in support of guilty plea. [116]

---

[106] *Id* at 22.
[107] *Id.* at 23.
[108] *Id.* at 24.
[109] *Id.at*
[110] *Id* at 28.
[111] /dat 28-29.
[112] *ld.* at 29.
[113] *Id* at 30.
[114] *Id.* at 31.
[115] *Id.* at 32.
[116] *Id.* at 35.

108. Petitioner acknowledged that he stated he was pleading guilty of his own free will and that he believed himself to be guilty. He acknowledged that after completing 33 questions on the form, he stated he still wished to plead guilty and that he was satisfied with his attorney. [117]

I09. Petitioner acknowledged signing the rights waived by guilty plea form.[118] Petitioner agreed that he had discussed the guilty plea with his father before pleading guilty.[119] Petitioner aclmowledged that he stated on the guilty plea forms that he was not under the influence when he answered the questions.

110. Petitioner's trial counsel testified at the omnibus hearing. [120]

111. Counsel had reviewed his file and spoken with habeas counsel to prepare for the hearing. He had practiced criminal law for twenty-four years. [121]

1I 2. He had experience representing juveniles who were transferred to adult jurisdiction. [122]

113. He did not recall exactly how many hours he spent representing Petitioner. He was appointed shortly after Petitioner's arrest and represented Petitioner until he was sentenced after his eighteenth birthday. [123]

114. Trial counsel discussed the charges and facts of the case with Petitioner at the detention center. He disagreed with Petitioner's assertion that he (counsel) had only visited twice, but agreed it was "not a great number of times..."[124]

115. Petitioner had not been in trouble before and did not have drug problems. CoW1se1 was aware that Petitioner's mother had committed suicide shortly before Petitioner's crimes.[125]

---

[117] *Id* at 37.
[118] *Id.* at 38.
[119] *Id.* at39.
[1⑩] *Id*. at 40.
[121] *Id.* at 41.
[122] *Id* at 42.
[123] *Id.* at 43.
[124] *Id.* at 44.
[125] *Id.* at 46.

116. Counsel did not request that his client be psychiatrically evaluated because Petitioner appeared to have a good understanding of what was going on, was acting normally, was not suffering from obvious emotional distress, and did not act in a way that raised concerns about his psychological state.[126]

117. Counsel received discovery from the state.[127] When asked about a Firearms Trace Fonn listing Petitioner and a codefendant as having "possession" of the murder weapon, Counsel stated that both his client and the co-defendant had admitted having possession of the gun.[128]

118. Counsel discussed the State's evidence, specifically witness statements from the codefendants, with his client.[129]

119. Counsel did not know if he reviewed certain cell phone records, the preliminary hearing transcript, or a DVD of the crime scene with his client; but did recall reviewing with Petitioner a witness statement (not a co-defendant) and the co-defendant's plea agreement.[130]

120. Counsel reviewed the most important evidence with his client.[131]

121. Habeas counsel inquired regarding the Jack of findings on the juvenile commitment order. However, those questions, and the failure to answer them, do not rise to the level of a constitutional violation. The questions are on the form so the State can receive reimbursement from the federal government.[132]

---

[126] *Id.* at 47.
[121] *Id.*
[128] */d.* at 49.
[129] *Jd.*
[130] *Id.* at 51.
[131] *Id* at 52.
[132] *Id* at 54.

122. However, trial counsel did not find the "missing" portions to be of any import. He noted that he had access to the Court at any time to file a motion seeking pre-trial release of his client if he believed there to be any possibility of such release. [133]

123. The transfer hearing was contested. [134] No response to the motion to transfer was filed. There was no basis to object to the motion because Petitioner was charged with first-degree murder and there were no fonnal mistakes in the State's motion. [135]

124. CoWlsel explained the transfer motion to his client. [136]

125. Counsel had reviewed the transfer order, which stated that it was based on Petitioner's statement and the coroner's report. He also was certain there was other evidence from the police. [137]

126. At the time of the transfer hearing, Counsel was fully aware of what needed to be determined to decide whether a juvenile's statement was voluntary and admissible. [138]

127. Counsel stated that the factors; including age, education, knowledge of rights, substance of the charge, presence of family (or friends or an attorney), interrogation before or after being charged, methods of the interrogation, length of the interrogation, refusal to continue during the interrogation, and any subsequent repudiation; were analyzed at the transfer hearing. [139]

128. Counsel stated that he specifically argued that the statement was taken in violation of the Prompt Presentment Rule, that Petitioner did not understand his Miranda rights, and that the statement was involuntary. [140]

[133] *Id* at *54-55.*
[134] *Id.* at *55.*
[135] *Id* at 56.
[136] *Id.* at 57.
[137] *Id.* at 58.
[138] *Id* at 59.
[139] *Id.* at *59.*
[140] *Id.* at 63.

129. As to various issues habeas counsel raised regarding Petitioner's motion to suppress, trial counsel stated that he was not certain if any of the issues raised by habeas counsel were on solid legal grounds, and that if any were, they would have been heard at the suppressfon hearing. [141]

130. Counsel had filed a motion to dismiss the robbery count on the basis that under the felony murder theory, a double jeopardy issue existed.[142]

131. The State agreed that *after a trial* on a felony murder theory, the convictions for both murder and the underlying felony would merge. [143]

132. Trial counsel informed Petitioner that under the plea agreement to murder and robbery, his sentences would be concurrent. Additionally, while Counsel could not remember how long he discussed any particular plea offer with his client, various plea offers arid plea deals were discussed during the time he represented Petitioner. [144]

133. Counsel advised Petitioner to accept the plea because he saw no viable defense at trial and he faced the possibility of life without parole if convicted at trial. [145]

134. The State did not intend to use Petitioner's confession during its case in chief. Nonetheless, trial counsel believed Petitioner would be convicted of felony murder based upon the other evidence available to the state.[146]

135. Counsel testified that he always writes the eJements of the offenses for his client in the paperwork supporting guilty pleas. Petitioner was not under the influence of drugs when he

[141] *Id.* at 65.
[142] *Id.* at 67.
[143] *Id.* at 67 (emphasis added).
[144] *Id.* at 71.
[145] *Id* at 73.
[146] *Id* at 74.

pleaded. [147] As to the answer "yes" to that particular question on the plea paperwork, Counsel testified that he must have misread the question.[148]

136. Counsel stated that it was not a Court's function to explain to a defendant, even a juvenile, the possible defenses or lesser included offenses. [149] Instead, these should be discussed with the lawyer prior to pleading. Counsel discussed defenses and lesser included offenses \\th his client during the course of his representation before Petitioner pleaded guilty. [150]

137. As to the plea proceeding itself, Counsel recalled that the Court advised Petitioner of the charges against him. He recalled that the Court told Petitioner that he had counsel and that it was counsel's duty to discuss possible defenses and lesser included offenses, and the Court asked Petitioner **if** that had occurred. [151]

138. The Court informed Petitioner of his statutory and constitutional rights, and the trial rights Petitioner was waiving as a result of his plea. [152]

139. Counsel did not discuss an appeal with his client because Petitioner pleaded guilty.[153]

140. Counsel represented Petitioner from shortly after the initial detention hearing through his plea and sentencing. He filed a motion to suppress Petitioner's statement during the juvenile transfer proceeding. [154] After the transfer hearing, counsel again filed a motion to suppress the statement for purposes of trial. Ultimately, no decision was made regarding the admissibility of the statement because Petitioner p]eaded guilty and did not go to trial. [155]

[154] *Id.* at 79.

[141] *Jd*
[148] *Id.* at 74-75.
[149] *Id.* at 75.
[150] *Id.* at 76.
[151] *Jd,* at 76-77.
[152] *Jd* at 77.
[153] *Jd.*

[155] *Id.* at 80.

---

[155] *Id.* at 80.

141. Counsel would never advise a client to plead guilty, or alternatively, proceed to trial, if Counsel had not spent sufficient time to advise knowingly the client of the better option.[156] Therefore, he had sufficient time to advise his client about the plea.[157]

142. Counsel discussed the evidence with Petitioner. That evidence included Petitioner's statement in which he admitted planning and participating in an attempted robbery, that he (Petitioner) had the gun, and that he fired the gun resulting in the death of the victim. Additionally, there were statements from two codefendants in which they admitted planning the robbery and stated that Petitioner had the gun and shot the victim. There were statements from two females who heard the robbery being discussed, saw the three juveniles leaving the car and returning, and heard Petitioner admit to shooting the victim.[158]

143. Counsel believed the plea to be in Petitioner's best interest because it avoided the possibility of life \Vithout parole, which was a real option based upon the state of the law when Petitioner pleaded guilty.[159]

144. Counsel discussed possible defenses with his client.[160]

145. Counsel clarified that although he wished he had asked for Petitioner to be psychiatrically evaluated, he had no information at the time that led him to question his client's competence or criminal responsibility. Petitioner was oriented, had good recollection, understood what Cowlsel was saying, answered questions appropriately, and if he did not understand, Petitioner asked for an explanation.[161]

[156] *Id.*
[157] *Id.* at 91.
[158] *Id.* at 82.
[159] *Id.*

[161] *Id.* at 84.

23

[160] *Id.* at 83-84.

[161] *Id.* at 84.

146. Petitioner understood the defendant's statement in support of guilty plea, rights waived by guilty plea, and the questions asked on those forms. He asked no questions that would indicate he did not understand the plea paperwork. Counsel did not force his client to alter any answer on the plea paperwork. Counsel did not coerce his client to plead guilty. If Petitioner had stated he did not want to plead, Counsel would not have said or done anything to coerce a plea. If Petitioner had indicated in any way that the plea was not voluntary, Counsel would have infonned the State there was no plea deal and then proceeded to trial. If Petitioner had stated he did not understand what he was doing, Counsel would not have gone fonvard with the plea. As far. as Counsel could tell, the plea appeared to be entered into knowingly, voluntarily and intelligently .162

## CONCLUSIONS OF LAW AND DISCUSSION

1. Jurisdiction and venue are properly in Kanawha County because Petitioner's crimes and conviction occurred in Kanawha County.

2. Petitioner has been convicted of a crime(s) and is currently incarcerated, he may thus pursue relief by virtue of a petition for writ of habeas corpus.

3. In *State ex rel. Tune,* the Supreme Court of Appeals of West Virginia explained that "[t)he sole issue presented in a habeas corpus proceeding by a prisoner is whether he is restrained of his liberty by due process of law."163

4. A petition for writ of habeas corpus is advanced to review errors of constitutional dimension; a habeas corpus action is not a substitute for judicial review of ordinary tdal error.164

---

162 *Id* at 85-86.
163 Syl. Pt. I, *State ex rel. Tune v. Thompson,* 151 W. Va. 282, 151 S.E.2d 732 (1966).
164 Syl. Pt. 4, *State ex rel. McMannis* v. *Mohn,* 163 W. Va. 129, 254 S.E.2d 805 (1979); Sy!. Pt. 4, *State ex rel. Kitchen* v. *Painter,* 226 W. Va. 278, 700 S.E.2d 489 (2010).

5. Syllabus point 4 of *State ex rel. ltlcMannis v. Mohn* states in part that a "habeas corpus proceeding is not a substitute for a \vrit of error in that ordinary trial error not involvi ng constitutional violations will not be reviewed."[165]

6. "Habeas corpus proceedings are civil proceedings. The post-conviction habeas corpus procedure provided for by Chapter 85, Acts of the Legislature, Regular Session, 1967, is expressly stated therein to be 'civil in character and shall under no circumstances be regarded as criminal proceedings or a criminal case.'"[166] The burden is on Petitioner to prove his claims by a preponderance of the evidence.

7. According to the *Rules Governing Post-Conviction Habeas Co1pus Proceedings in West Virginia,* courts are required to conduct an initial evaluation of habeas petitioners before appointing counsel or requiring an answer from the respondent.[167] Further, the court may refuse the petition if it is satisfied that the petitioner is entitled to no relief after the court reviews the petition, documentary evidence, the record of the underlying conviction, and the record of any other prior petitions.[168]

8. Peti tioner has been "convicted of a crime and incarcerated under sentence of imprisonment therefor" within the meaning of W. Va. Code § 53-4AM1(a). Venue lies in Kanawha County pursuant to Rule 3(a) of the *Rules Governing Post-Conviction Habeas Corpus Proceedings* because Petitioner was convicted and sentenced in the Circuit Court of Kanawha County.

9. The Supreme Court of Appeals of West Virginia has stated that "[o]ur post-conviction habeas corpus statute . . . clearly contemplates that a person who has been convicted of a crime is

---

[165] 163 W. Va. 129, 254 S.E.2d 805 (1979).
[166] *State ex rel. Harrison v. Coiner,* 154 W. Va. 467, 476, 176 S.E.2d 677, 682 (1970).
[167] W. Va. R. Hab. Corpus, Rule 4(b).
[168] W. Va. Code § 53-4A-3(a).

25

ordinarily entitled, as a matter of right, to only one post-conviction habeas corpus proceeding."[169] The initial habeas corpus hearing is *res judicata* as to all matters raised and to all matters *knovm* or which with reasonable diligence could have been known. Therefore, only ineffective assistance of habeas counsel, newly discovered evidence, or a change in law favorable to the applicant which may be applied retroactively can be considered in any subsequent habeas petition. [170]

10. A petitioner is entitled to careful consideration of his claims. Such consideration is necessary in order to ensure that no violation of the petitioner's due process rights could have escaped the attention of either the trial court or State Supreme Court. Circuit courts denying or granting relief in a habeas corpus case are statutorily required to make specific findings of fact and conclusions of law relating to each contention advanced by a petitioner and to state the grounds upon which the matter was determined. The State Supreme Court has held that where a petitioner fails to provide adequate factual support for his allegations and makes nothing more than mere blanket assertions without the appropriate factual basis, the claims must be denied. [171]

11. Pursuant to W. Va. Code § 53-4A-7, the court shall enter an order denying relief if based on the petition, affidavits, exhibits, records, and other documentary evidence that the petitioner fails to meet a probable cause standard, or if the grounds in the petition have previously been adjudicated or waived.

12. Findings of fact made by a trial court in a habeas proceeding "will not be set aside or reversed by [the State Supreme Court] unless such findings are clearly wrong."[172] A circuit court's

---

[169] Syl. pt. 1, *Gibson v. Dale,* 173 W. Va. 681, 319 S.E.2d 806 (1984).
[110] Syl. Pt. 4, *Losh* v. *McKenzie,* 166 W. Va. 762, 277 S.E.2d 606 (1981); *Ca/I v. McKenzie,* 159 W Va. 195, 220 S.E.2d 665 (1975).
[171] *State ex rel. /vfarkley v. Coleman,* 215 W. Va. 729, 601 S.E.2d 49 (2004).
[112] *Mugi1ano v. Painter,* 212 W.Va. 831, 833, 575 S.E.2d 590, 592 (2002).

final order and disposition are reviewed under the abuse of discretion standard and conclusions of law are reviewed *de novo*.[173] A circuit court's entry of summary judgment is reviewed *de novo*.[114]

13. Petitioner is asserting ineffective assistance of counsel. As is repeatedly noted in cases dealing with ineffective assistance of counsel, the test deriving from *Strickland/Miller* is that counsel will be found constitutionally ineffective if: "(l) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that but for counsel's unprofessional errors the result of the proceedings would have been different."[175]

14. In its 1995 *Miller* opinfon, the State Supreme Court adopted the Supreme Court of the United States' *Strickland* test for evaluating the effectiveness of counsel necessary to conform to a defendant's constitutional right to counsel.[176] In syllabus point 5, the *Miller* Court held that:

> In West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington:* (1) CoW1sel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that but for counsel's unprofessional errors the result of the proceedings would have been different

(Citations omitted). The *Miller* Court also noted that:

> [C]ourts must apply an objective standard and detennine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.

*Id* at Syl. Pt. 6. Justice Cleckley, writing for the majority, also quoted *Strickland* to show that courts "'must indulge a strong presumption that counsel's conduct falls within the wide range of

[11;]*Id.*
[174] *Id.* at Syl. Pt. 2.
[175] Syl. Pt. 5, *State v. Miller,* 194 W. Va. 3, 459 S.E.2d I 14 (1995).
[176] *See, Miller, supra.*

reasonable professiona] assistance ..."'[177] The State Supreme Court has also held that "[u]nless claims of ineffective assistance of counsel have substantial merit, this Court, historically, has taken a negative view toward the assertion of frivolous claims."[178]

15. "Failure to meet the burden of proof imposed by either part of the *Strickland/Miller* test is fatal to a habeas Petitioner's claim."[179]

16. The *Strickland* standard is not easily satisfied.[180]

17. In *Miller,* the Court outlined the challenge faced by a petitioner claiming ineffective assistance, noting that judicial review of a defense counsePs perfomlance "must be highly deferential" and explaining that there exists a strong presumption that "counsel's performance was reasonable and adequate."[181] Moreover, the *Miller* Court held that there is a "wide range" of performance which qualifies as constitutionally adequate assistance of counsel, stating that

> A defendant seeking to rebut [the] strong preswnption of effectiveness bears a difficult burden because constitutionally acceptable performance is not defined narrowly and encompasses a "wide range." The test of ineffectiveness has little or nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We only ask whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.

*Id., see also Vematter,* 207 W. Va. at 17, 528 S.E.2d at 213 ('there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ...'") (quoting *Strickland,* 466 U.S. at 689).

---

[177] *id* at 15, 459 S.E.2d at 126, (quoting *Strickland,* 466 U.S. at 689).

[178] *State ex rel. Daniel v. Legursky,* 195 W. Va. 314, 319, 465 S.E.2d 416, 421 (1995).

[179] *State ex rel. Vernatter v. Warden, W. Va. Penitentiary,* 207 W. Va. 11, 528 S.E. 2d 207 (l999).

[180] *See, Miller,* I94 W. Va. at I6 ("the cases in which a defendant may prevail on the ground of ineffective assistance of counsel are few and far between."); *State ex rel. Daniel* v. *Legursky,* 195 W. Va. 314, 319, 465 S.E. 2d 416, 421 {1995)(ineffective assistance claims are "rarely" granted and only when a claim has "substantial merit"); *see also. Whiting v. Burt,* 395 F.3d 602, 617 (6th Cir. 2005)("Petitioners claiming ineffective assistance of counsel under *Strickland* have a heavy burden of proof ').

[181] *Miller,* 194 W.Va. at l6, 459 S.E.2d at 127.

18. A petitioner claiming ineffective assistance must identify specific "acts or omissions" of his counsel believed to be "outside the broad range of professionally competent assistance."[182]

19. The reviewing court is then tasked with determining, "in light of alJ the circumstances" but without "engaging in hindsight," if that conduct was so objectively unreasonable as to be constitutionally inadequate.[183]

20. Identifying a mere mistake by defense counsel is insufficient.[184] As the *Miller* Court noted, "with [the] luxury of time and the opportunity to focus resources on specific facts of a made record, [habeas counsel] inevitably will identify shortcomings in the performance of prior counsel." However, "perfection is not the standard for ineffective assistance of counsel."[185]

21. Even if defense c0lmsel's conduct is deemed objectively unreasonable and thus satisfies the first *Strickland* prong, that conduct does not constitute ineffective assistance unless the petitioner can also establish that the deficient conduct had such a significant impact that there exists a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."[186] As the U.S. Supreme Court explained, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."[187] Thus, satisfying *Strickland's*

---

[182] *Miller,* 194 W. Va. at 17, 459 S.E.2d at 128; *Stare ex rel. Myers v. Painter,* 213 W. Va. 32, 35, 576 S.E.2d 277, 280 (2002X..{t]he first prong of [the *Strickland]* test requires that a Petitioner identify the acts or omissions of counsel that are alleged not to have been the result ofreasonable professional judgment).
is; *Miller,* 194 W. Va. at 17, 459 S.E.2d at 128.
[184] *See, Edwards* v. *UnitedStates,* 256 F.2d 707, 708 (D.C. Cir. 1958)("Mere improvident strategy, bad tactics, mistake, carelessness or inexperience do not . . . amount to ineffective assistance of counsel, unless taken as a whole the trial was a 'mockery ofjustice"').
[185] *Miller,* 194 W. Va. at 17, 459 S.E.2d at 128.
[186] Sy!. Pt. 5, *Miller, supra.*
[187] *Strickland,* 466 U.S. at 691

"prejudice prong" requires a showing that counsel's deficient performance was serious and impactful enough to "'deprive the defendant of a fair trial, a trial whose result is reliable.'"m

22. No precise formula exists that may be applied in all cases to determine if the constitutionally inadequate conduct in question so significantly degraded the reliability of the trial such that the prejudice prong is satisfied. [189] But there is no question that the burden of demonstrating prejudice lies with Petitioner. [190]

23. The State Supreme Court has noted that the standard of review for performance of counsel in habeas matters requires that but for the alleged errors, the result in Petitioner's action *would* have been different, not *could* have been different. [191]

24. In cases involving a criminal conviction based upon a guilty plea, the prejudice requirement of the two-part test established by *Strickland* and *Miller* demands that a habeas Petitioner show that there exists a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. [192]

> In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or diScover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in tum, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.

---

[188] *State ex rel. Strogen v. Trent,* 196 W. Va. 148, 469 S.E.2d 7, 12 n.4 (I996)(quoting *Strickland,* 466 U.S. at 687); *Myers,* 2I3 W. Va. at 36, 576 S.E.2d at 281 (2002)("The second or "prejudice" requirement of the *Strick/and/Miller* test looks to whether counsel's deficient performance adversely affecte.d the outcome in a given case").

IM*Legursky,* 195 W. Va. at 325, 465 S.E.2d at 427 ("[a]ssessments of prejudice are necessarily fact-intensive detenninations peculiar to the circumstances of each case").

[190] *Strickland,* 466 U.S. at 693; *Legursky,* 195 W. Va. at 319, 465 S.E.2d at 421.

[191] *See, Brannon v. Pszcolkowski,* WVSCA Memorandum Decision in 17-0629, filed October lO, 2018.

[192] Sy!. Pt. 6, *State ex rel. Vernatler v. Warde11, W Va. Penitentiary,* 207 W. Va. 11, 14, 528 S.E.2d 207, 21O (1999),

*Hill v. Lockhart,* 474 U.S. 52 at 56-60 (1985).

> Before a guilty plea will be set aside based on the fact that the defendant was incompetently advised, it must be shown that (1) counsel did act incompetently; (2) the incompetency must relate to a matter which would have substantially affected the fact-finding process if the case had proceeded to trial; (3) the guilty plea must have been motivated by this error.

Syl. Pt. 3, *State v. Sims,* 162 W. Va. 212, 248 S.E.2d 834 (1978).

25. In examining effective assistance of counsel in a guilty plea situation, Petitioner bears the burden of demonstrating that trial counsel•s performance was deficient and must also prove that the outcome of the proceedings would have differed had he gone to trial. A defendant must demonstrate that the deficient advice had a negative impact on the outcome of the proceedings. He must show that but for counsel's errors, he would have insisted on going to trial and that the outcome of the proceedings would have been more favorable than the plea. [193] This Court FINDS that counsel was not ineffective regarding any aspect of the plea. Further, the Court notes that Petitioner received a sentence of Jife with mercy, and had Petitioner proceeded to trial, the outcome of the proceedings may have been less favorable than the plea, particularly a sentence of life without mercy, especially due to the nature of the crime.

26. In analyzing habeas petitions based upon guilty pleas, the West Virginia Supreme Court has stated that:

> We agree with the habeas court's finding that the record during the proceedings below was sufficient to establish that the trial counsel's perfonnance was not ineffective regarding Petitioner's competence, readiness, and voluntariness in entering into the plea agreement. In *Call v. McKenzie,* we observed that "[t]he most common issues in [h]abeas corpus cases are whether there were, indeed, knowing and intelligent waivers, whether there were facts outside the record which improperly caused the defendant to enter his plea, and whether defendant's counsel was indeed competent." We found that these issues "can all be finally resolved in the careful taking of the original plea" and outlined certain inquiries that should be made prior to the acceptance of a plea. Where a plea bargain has been entered into, [11]the trial court should spread the terms of the bargain upon the record and

---

[193] *Jerry R. v. Ballard,* 2014 WL 2723895, WVSCA Memorandum Decision, 13-1090 at \*\*3-6 (June 16, 2014).

31

inten-ogate the defendant concerning whether he understands the rights he is waiving by pleading guilty and whether there is any pressure upon him to plead guilty other than the consideration admitted on the record." Additionally,

> A trial court should spread upon the record the defendant's education, whether he consulted with friends or relatives about his plea, any history of mental illness or drug use, the extent he consulted with counsel, and all other relevant matters which will demonstrate to an appellate court or a trial court proceeding in [h]abeas corpus that the defendant's plea was knowingly and intelligently made with due regard to the intelligent waiver of known rights.

*Jones v. Terry,* 2018 WL 1719521, WVSCA Memorandum Decision, 17-0093 (April 9, 2018) (citations omitted).

27. The West Virginia Supreme Court has noted that the standard for review of the performance of counsel in habeas matters is based upon *Strickland/Miller.* That standard requires that but for the alleged errors, the result in Petitioner's action *would* have been different not *could* have been different.[194]

28. "Whether in the first habeas corpus petition or a subsequent habeas corpus petition, habeas corpus allegations must have adequate factual support. 'A mere recitation of any of our enumerated grounds without detailed factual supp0lt does not justify the issuance of a *writ,* the appointment of counsel, and the holding of a hearing.'"[195]

> (a) Form of Petition; Copies. Any person in this State seeking post-conviction habeas corpus relief, either in the circuit courts or in the Supreme Coult of Appeals, shall file an original and two copies of a petition. The petition shall be in substantially the form annexed to these rules as Appendix A. The petition shall specify: (1) all the grounds for relief which are available to Petitioner; (2) a summary of the facts supporting each of the grounds specified; and (3) a specific statement of the relief requested.

W. Va. R. Hab. 2.

> Evaluation for Summary Dismissal; Contents of Summary Dismissal Order. The petition shall be examined promptly by the judge to whom it is assigned. The

---

[194] *Brannon, supra.*
[195] *Losh,* 166 W.Va. at 771, 277 S.E.2d at 612; *Markley v. Coleman,* 215 W. Va. 729, 734, 601 S.E.2d 49, 54 (2004).

court shall prepare and enter an order for summary dismissal of the petition if the contentions in fact or law relied upon in the petition have been previously and finally adjudicated or waived. The court's summary dismissal order shall contain specific findings of fact and conclusions of law as to the manner in which each ground raised in the petition has been previously and finally adjudicated and/or waived. If the petition contains a mere recitation of grounds without adequate factual support, the court may enter an order dismissing the petition, without prejudice, with directions that the petition be refiled containing adequate factual support. The court shall cause Petitioner to be notified of any swnmary dismissal.

W. Va. R. Hab. 4.

29. "A knowing and voluntary guilty plea waives all antecedent, nonjurisdictional defects."[196] "If any principle is well settled in this State, it is that, in the absence of special circumstances, a guilty plea waives all antecedent constitutional and statutory violations save those with jurisdictional consequences."[197] This Court finds that, despite the Jack of transcripts from the plea, transfer, and sentencing hearings that the material available from the underlying file and the testimony at the omnibus hearing are more than sufficient for the Court to conclude that Petitioner has failed to meet his evidentiary burden as to any claim.

A. The Trial Court had jurisdiction to take the plea, as there was no error in the transfer proceeding. Petitioner's confession was voluntary both as to the waiver of Petitioner's rights and prompt presentment. That confession supported probable cause for the transfer. The order granting transfer contains sufficient findings of fact and conclusions of law.

1. Petitioner's statement was voluntary and not in violation of the prompt presentment statute. As the statement was admissible for the purposes of the transfer hearing, the Court could base its transfer decision on that statement.

---

[196] *State v. Proctor,* 227 W. Va. 352, 364, 709 S.E.2d 549, 561 {2011).

[197] *Pethel v. McBride,* 219 W. Va. 578, 595, 638 S.E.2d 727, 744 (2006)(quoting *State v. Greene,* 196 W. Va. 500, 505, 473 S.E.2d 921, 926 (1996)(CJeckley, 'J., concurring); *Call, supra* ("the defendant must fully understand that by entering a plea of guilty he waives all pre trial defects with regard to his arrest, the gathering of evidence, prior confessions, etc., and further, that if he enters a plea of guilty he waives all non.jurisdictional defects in the criminal proceeding."); *see also, State v. Legg,* 207 W. Va. 686, 690, 536 S.E.2d 1 10, 114, n.7 (2000)("[w]hen a defendant unconditionally and voluntarily pleads guilty to an offense, the defendant generally waives nonjurisdictional objections to a circuit court's rulings, and therefore cannot appeal those questions to a higher court;. Claims of nonjurisdictional defects in the proceedings, such as unlawfully or unconstitutionally obtained evidence or illegal detention, generally will not survive a plea bargain.")(citations omitted).

2. Petitioner's voluntary statement; given to police after knowingly, voluntarily, and intelligently waiving his right to remain silent and not given in violation of the prompt presentment statute; provided more than ample probable cause for the transfer order.

3. The juvenile transfer statute in 2006, contained in W. Va. Code § 49-5-10, provided in subsection (d)(l) that the court *shall* transfer a juvenile to criminal jurisdiction if there was probable cause to believe the juvenile had committed murder or robbery with a fireann.

4. The transfer order specifically found that Petitioner's statement was voluntarily given after Miranda warnings and that the police followed *all* appropriate legal procedures. The statement, in brief, contained admissions that Petitioner stated that he asked "him" (the victim) what time it was, and that the victim called him the n-word. Petitioner had the gun out, the victim approached him, and Petitioner got scared and pulled the trigger. Petitioner stated he had found the gun and was carrying it for protection. Petitioner denied that it was his intention to rob the victim. However, he later admitted that it was Botkin's suggestion that they rob the victim.

5. Petitioner stated that Hambleton and Botkin also exited the car. After the shooting, they fled to Famswo1th Drive where Botkin and Hambleton got out Petitioner went on to his home. Petitioner reiterated that the victim came toward him first, but that was all Petitioner would say.

6. Dr. Boiko testified during the transfer hearing that the victim died from one gunshot wound to the heart. That testimony provided more than probable cause, and Petitioner was properly transferred to the criminal jurisdiction of the Court.

7. Petitioner is simply in error when he says no findings of fact or conclusions of law were given on the record. The Court entered an order containing both findings of fact and conclusions of law. As noted above, the transfer order found that the evidence before the Court consisted of reports from Charleston Police Detective Eggleton and the medical examiner, as well as the

audio/video statement of Petitioner. The Court found probable cause to believe that Petitioner participated in an attempted first-degree robbery and murder of the victim. The victim was shot once in the chest and the medical examiner testified that. to a reasonable degree of medical certainty, that gunshot caused the victim's death.

8. The offense occurred at the BB&T parking garage in Charleston, WV. Petitioner was 16 years old at the time of the offense. The Court found that Petitioner's statement was voluntarily given, that the police followed all appropriate legal procedures, and that Petitioner knowingly and intelligently waived his rights prior to the interrogation. Petitioner's admissions were consistent with the physical evidence. Petitioner admitted that he was in a car with other juveniles when another juvenile suggested robbery.

9. When the victim was spotted, another juvenile said, "let's get him" and Petitioner, with the two other juveniles, exited the car and approached the victim. Petitioner admitted to having a gun and shooting the victim during the attempted robbery. He admitted throwing the gun away in the bushes, where the Charleston Police Department found a gun.

10. The Court concluded as a matter of Jaw that Petitioner's statement was admissible because it was properly taken by police detectives. The Court concluded that there was probable cause to believe Petitioner committed the offense of first-degree murder. Having found probable cause that Petitioner committed first-degree murder, transfer was mandatory.

11. Assuming for the purposes of argwnent only that the transfer decision had been appealed and the statement ruled inadmissible, the State would have had the opportunity to hold a second transfer hearing, at which the standard would again be probable cause. At a second, later transfer hearing, the State would have had available to it Dr. Boiko, the individual who testified as to the victim's cause of death by shooting, as well as the lay witnesses who heard the shot, saw

Petitioner and his codefendants flee the scene, comforted the dying victim, and identifed the vehicle in which the codefendants fled. 1lle State would have had the testimony of the juvenile females who saw Petitioner leave the car, saw the gun, heard the shot, and heard Petitioner make incriminating statements. The State could have called the driver of the car. Finally, the State would have had available to it the testimonies of the codefendants, which were consistent with one other, in that a robbery was planned and that Petitioner shot the victim when he "rushed" Petitioner.

12. Petitioner would have been transferred to adult jurisdiction. Therefore, although there was no eITor in the transfer hearing, any asserted error would not give relief in habeas because it did not affect the ultimate result of the proceedings.

13. As to the lack of a transcript, the burden is on Petitioner to demonstrate constitutional error in the proceedings. The Court may not presume error or speculate as to error.

14. The decisions of the Circuit Court are deemed to be correct, unless and until error can be demonstrated.

> An appellant must carry the burden of showing error in the judgment of which he complains. This Court will not reverse the judgment of a trial court *unless* error affirmatively appears from the record. Error will not be preswned, all presumptions being in favor of the cotTectness of the judgment.

Sy!. Pt. 4, *State v. Myers,* 229 W. Va. 238, 241, 728 S.E. 2d 122, 130 (2012).

> There is always a presumption of regularity in all judicial proceedings . . . The presumption of law is in favor of the c0lTectness of the lower court. . .Where the record is so imperfect as not to disclose error in a judgment, it is presumed to be right, and on writ of error will be affomed.

*Rollins v. Daraban,* 145 W. Va. 178, 184, 113 S.E.2d 369, 373 (1960) (internal citations omitted).

> Furthennore, this Court has created the presumption of regularity of court proceedings and established the burden of proving error in the proceedings . . .. The general rule is that there is a presumption of regularity of court proceedings; it remains until the contrary appears and the burden is on the person who alleges such irregularity to affirmatively show it.

*State ex rel. Godfrey v. Rowe,* 221 W. Va. 218, 221, 654 S.E.2d 104, 107 (2007) (internal citations omitted .)

> There is a presumption of regularity of court proceedings that remains until the contrary appears, and the burden is on the person who alleges such irregularity to show it affinnatively; and where an order of a court of record is merely silent upon any particular matter, it will be presumed, not withstanding such silence, that such court performed its duty in every respect as required by law . . . .

Syl. Pt. 2, *In re J S.,* 233 W. Va. 198, 757 S.E.2d 622 (2014).

15. The proceedings are presumed correct and Petitioner has not sustained his burden of demonstrating prejudicial error. This contention affords Petitioner no relief.

B. Petitioner's confession was valid, voluntary, and not obtained in violation of the prompt present statute.

1. The voluntariness of a statement and its admissibility in Court are just two of the many issues which are waived by entry of a knowing, voluntary, and intelligent guilty plea. Therefore, Petitioner cannot attack the confession in this collateral proceeding.

2. However, the extant record demonstrates that the confession was voluntary, given after administration of the juvenile Miranda warnings, not obtained by police deception or coercion, and not in violation of the prompt presentment statute.

3. As to prompt presentment, violation of that statute may render a confession inadmissible, but does not violate any constitutional right. That is, the West Virginia prompt presentment statute is simply a legislative enactment. Prompt presentment is not a constitutional right.

4. The record demonstrates that Petitioner left his home with the police at 4:15 a.m. The Miranda waiver and statement started at 4:26 a.m. and questioning ceased at 4:49 a.m. The police returned at 5:01 a.m. and informed Petitioner that he would be take-n across the street to see a magistrate and most likely be detained. Additionally, police said an attorney would be appointed to represent him. Petitioner was processed and taken to magistrate court at about 5:20 a. m.

5. The prompt presentment statute was designed to ensure that individuals do not languish for hours in police custody before being brought before a judicial officer. It was not designed to prohibit confessions or to inhibit the ability of police to obtain confessions, even from a juvenile.

6. In *State v. Sugg*,[198] the juvenile, who was transferred to adult jurisdiction, argued his confession was invalid because he had not been promptly presented to a magistrate. The defendant arrived at the station at 10:00 p.m., indicated he wanted to talk, signed a waiver at 10:36 p. m., and gave a statement. The statement was recorded starting at about 10:50 p. m. and the juvenile was not presented to a magistrate until 1:30 or 2:00 a. m. Although the decision does not indicate how long it took to take the statement, Petitioner signed his statement at 12:45 a.m.[199]

7. The Court noted that a confession otherwise proper is not necessarily invalid, even if obtained prior to the juvenile's presentment to a magistrate. The time periods involved in transportation to the station, completion of booking, recording, and transcribing a statement do not offend prompt presentment.[200]

8. Therefore, the only "delay" to be examined in this matter is the time between starting administration of the Miranda warning and the end of the statement at approximately 5:01 a. m. That time period is roughly thirty-five minutes. Petitioner was willing to talk to the police, and the police were entitled to take his statement. The police are not compelled to inform an individual, even a juvenile, not to confess if the individual wishes to confess. Petitioner was willing to give a statement, was at the station for less than an hour including a twelve-minute break and the booking procedures. There was no unnecessary delay and the statement was not inadmissible.

---

[198] 193 W. Va. 388, 456 S.E.2d 469 (1995).
[19] *Sugg* at 395, 456 S.E.2d 469 at 476.
[200] *Sugg* at 395-396, 456 S.E.2d 469 at 476-477.

9. The statement was also voluntary and given after a valid waiver of the juvenile's Miranda rights. The Trial Court, at the transfer hearing, determined that the statement was voluntary and given after a valid waiver of Miranda rights, and that the po]ice followed all appropriate procedures. Petitioner challenged the admission of the statement on prompt presentment and invalid waiver grounds; the Court rejected that challenge.

10. There is no contrary evidence to demonstrate the Court's ruling was incorrect. Petitioner was arrested at his home after an unsuccessful attempt by his father to mislead the police as to Petitioner's location. Petitioner was taken to the police station. Before confessing, the police explained the juvenile waiver form. The form clearly indicated that Petitioner was under arrest for a shooting murder. Therefore, Petitioner was informed by the police before he signed his waiver and before he confessed that he was under arrest for murder.

11. Petitioner was 16 years old and had completed ten years of schooling at the time he confessed. The police scrupulously went over each of the rights Petitioner had, asked him if he understood those rights, and asked him to initial that he understood those rights. Petitioner initialed that he understood those rights. The police read the waiver to Petitioner and asked him if he understood. They then asked him to signify whether he was or was not willing to talk to the police. He indicated that he was willing. The transcript of the statement does not demonstrate that Petitioner had any questions other than we was required to talk to the police, and the police told him he absolutely did not need to talk to them.

12. There is nothing to indicate that Petitioner failed to understand his rights or failed to understand the waiver of them. He was informed of the crime with which he was charged, told he was not forced to talk to the police even after signing the waiver, and yet Petitioner still chose to answer questions from police. There is absolutely no indication of police pressure or coercion in

inducing Petitioner to sign the waiver and give a statement, just as the Court found when it admitted the statement at the transfer hearing. During the statement, one of the officers mentioned his understanding of how difficult things must be since the recent death of Petitioner's mother. However, the police did not suggest that he should confess because his mother would want him to, nor that she was watching to ensure that he did the right thing. It was merely an expression of sympathy, and police officers are not forbidden from acknowledging the human circumstances in which defendants find themselves.

13. Additionally, police are permitted to tell defendants that others have given inculpatory statements when in fact they have not.

14. "Misrepresentations made to a defendant or other deceptive practices by police officers will not necessarily invalidate a confession unless they are shown to have affected its voluntariness or reliability.[11][201]

15. "Whether an extrajudicial inculpatory statement is voluntary or the result of coercive police activity is a legal question to be determined from a review of the totality of the circumstances" surrounding the confession.[202]

16. Before the transfer, the Court had an opportunity to review the audio/video recording of the statement and determined, under the totality of the circumstances, that the statement was admissible. In the absence of any evidence to the contrary, even considering the absence of the transcript, this decision was correct. The actions of the Circuit Court are presumed to be correct.

17. In reviewing the statement, Petitioner was not detained unnecessarily at any point before he gave his statement. In fact, it appears Petitioner was in police custody for 65 minutes in total. That time includes transportation to the station, the statement, a twelve-minute break, and

_____

[201] Syl. Pt. 6, *Srate v. Worley,* 179 W. Va. 403, 369 S.E.2d 706 (1988).
[202] Syl. Pt. 2, *State* v. *Bradshaw,* 193 W.Va. 519, 457 S.E.2d 456 (1995).

40

booking procedures. Petitioner was willing to speak to the police. The police scrupulously read Petitioner his Miranda rights and asked Petitioner to acknowledge he understood them. He signified he did. The police carefully went over the waiver of the rights and asked Petitioner to signify whether he was or was not willing to talk. He was. There is no evidence of coercion or undue influence to induce the waiver and no evidence Petitioner did not understand what he was doing. After questioning started, when Petitioner asked whether he needed to talk, he was told no, that it was entirely up to him. Questioning ceased when Petitioner said he did not have anything more to say. The expression of sympathy about Petitioner's mother and any references to others giving statements did not render the confession involuntary Wlder the totality of the circumstances.

18. "[A]juvenile can make a voluntary, knowing and intelligent waiver after he is properly apprised of his constitutional and statutory rights."[203] In *Sugg,* the defendant argued against the admission of his statement and the Court acknowledged there were factors mitigating against the admission including his age and limited involvement with the criminal justice system. Sugg read at a third-grade level. However, the Court noted there were a number of factors supporting an intelligent waiver including that the Miranda rights were indisputably read to the defendant and that there was a signed rights fonn with the defendant's initials beside each right. The Supreme Court also acknowledged its reluctance *to* overturn the factual findings of the trial court unless they were clearly erroneous.[204] In this case, the Trial Court determined the confession to be voluntary for the transfer hearing and there is nothing to suggest that the Court would have reversed itself at trial. The confession was voluntary, admissible, and not in violation of prompt presentment. Besides being waived by the entry of the plea, this contention is also unsupported by the evidence and affords Petitioner no relief.

[203] *Sugg, supra,* at 397, 456 S.E.2d 469 at 478.
[204] *Id.* at 397-398, 456 S.E.2d at 478-479.

C. Petitioner's plea was voluntary.

1. The confession was valid and Petitioner was properly transferred to adult jurisdiction. The guilty plea is not invalid because despite Petitioner's contention, he was properly transferred to the criminal jurisdiction of the Trial Court. Even though there exists no available transcript of the plea hearing, the proceedings in the Circuit Court are presumed to be correct and the burden is on Petitioner to demonstrate, with evidence, that the proceedings were not correct and that the plea was involuntary.

2. Petitioner unequivocally answered yes on the form as to whether his plea was voluntary. Castigating Trial counsel's answer that he vvrote the elements of the offense on the form as an "admission" is hardly a fair characterization. It is not uncommon in guilty pleas for the attorney to write down *all* answers on the defendant's statement. It is immaterial who wrote the answer, the issue is whether Petitioner knew the elements of the offense, which he did. His signature on that form and his attorney's statement demonstrate that Petitioner knew with what he was charged, including the elements.

3. Trial counsel did mark "yes" on the plea paperwork question asking whether Petitioner was under the influence of drugs or stimulants. This Court believes that was a mere mistake by defense counsel and likewise that trial counsel would not have permitted an impaired client to plead guilty, and this Court would not have accepted a plea from an impaired defendant. Petitioner himself denied being under the influence at the time of the plea. This contention is not supported by a preponderance of the evidence and does not afford Petitioner relief. Trial counsel testified at the omnibus hearing that he misread that particular question and that Petitioner was not under the influence at the time he pleaded guilty. Petitioner did not testify that he was under the influence of any substance when he pleaded.

42

4. It is a common complaint that individuals are not evaluated during the process. However, the request for an evaluation at any time during the process is dependent upon whether or not the attorney observes anything to indicate an evaluation would be proper.

> Although counsel did not request a mental evaluation of Petitioner before recommending the plea, there was nothing to suggest that this inquiry was appropriate at this stage of the proceeding. Counsel did not observe any unusual or suspect behavior on the part of his client that would warrant further inquiry into Petitioner's mental state because any unusual behavior Petitioner exhibited during the crimes could reasonably be attributed to intoxication. We note that counsel was an experienced criminal defense attorney who met with Petitioner on several occasions prior to the guilty plea and had ample opportunity to observe and assess Petitioner's demeanor.

*Lloyd v. Terry,* 2018 WL 1319187) Memorandum Decision, WVSCA, No. 16-1166 at*19 (March 14, 2018). Trial counsel met with Petitioner; observed nothing untoward; and was told nothing that made him believe his client was either not criminally responsible, not competent, or not capable of entering a valid plea. Therefore, he did not request an unnecessary evaluation. Although trial counsel testified that he "wished" he had requested that his client evaluated (in hindsight), in fact, there is no evidence to demonstrate that Petitioner should have been evaluated or how the results of any evaluation would have changed the results of the proceeding. At the omnibus hearing, trial counsel testified that his client was oriented, understood what was going on, responded appropriately, and asked appropriate questions. He observed nothing that led him to question his client's competence or criminal responsibility. This contention affords Petitioner no relief

5. Petitioner was an adult, legally, when he pleaded, and therefore it was unnecessary to follow any juvenile procedures in taking the plea. Petitioner was an adult, and the lack of the transcript does not mean that the plea was involuntary. Again, Petitioner must show error, and the Circuit Court's order is presumed to be correct. Trial counsel testified that he recalled the Court explaining to Petitioner his constitutional and statutory rights, as well as his rights at trial. He

further testified that the Court asked Petitioner whether he had discussed lesser included offenses and defenses with his attorney.

6. The extant plea paperwork reveals unequivocally that Petitioner's plea was knowing, voluntary, and intelligent. This contention affords Petitioner no relief.

D. DoubJe jeopardy was not violated by Petitioner's voluntary plea. The plea agreement is not ambiguous. Because Petitioner voluntary pleaded guilty, merger does not apply.

1. Petitioner voluntarily signed a plea agreement that provided he would plead guilty to first-degree murder and robbery, and the State would recommend mercy on the murder charge and forty years on the robbery charge to run concurrently with one another.

2. However, this was not a binding plea under Rule 11 of the *West Virginia Rules of Criminal Procedure* . Therefore, the Court had the option of running the sentences consecutively, sentencing Petitioner to more than forty years on the robbery, or withholding mercy on the murder charge. Petitioner could reasonably have expected that he might spend the rest of his life in prison without the possibility of parole. The guilty plea he signed and the order the Court entered accepting the plea reflect that Petitioner understood that the plea recommendation was not binding upon the Court and that he could receive a sentence well in excess of the State recommendation. Further, the defendant's statement in support of guilty plea indicates that he was aware that the maximum penalty he could receive was life in prison and any number of years greater than ten on the robbery. Petitioner received precisely the sentence that was contained in the plea letter. The sentence is not excessive and not more severe than Petitioner could reasonably have expected.

3. IfPetitioner went to trial he could not have been convicted and sentenced for both first-degree murder and robbery because this proceeding was predicated on the felony murder theory.

> The commission of the robbery and/or the arson was an essential element of the crime of felony-murder as proved by the State. The statutes which define arson and robbery do not require proof of any fact which the felony-murder provision did not.

> Consequently, we reaffirm our holding in *State ex rel. Hall v. Strickler, supra,* and, in reliance on that decision, we hold that double jeopardy prohibits an accused charged with felony-murder, as defined by W. Va. Code § 61-2-1, from being separately tried or punished for both murder and the underlying enumerated felony.

*State v. Williams,* 172 W. Va. 295, 310; 305 S.E.2d 251, 266 (1983).

4. Therefore, at trial, the State would have needed to prove the elements of robbery, beyond a reasonable doubt, and tht the victim's death occurred during the commission of the robbery. Petitioner could have been sentenced only for first-degree murder, if convicted *at trial.* But Petitioner voluntarily, knowingly, and intelligently pleaded guilty to the felony offenses of first-degree murder and robbery.

5. The plea letter was not ambiguous. It clearly informed Petitioner that the offer was to plead guilty to first-degree murder and robbery. There is no special statute regarding felony murder. W. Va. Code § 61-2-1 defines murder, and as to first-degree murder states that murder by poison, lying in wait, imprisonment, starving, or by any deliberate and premediated killing, or in the commission of, or attempt to commit robbery is murder of the first degree.[205]

6. One is indicted for murder. At trial, the State would need to elect before the case was submitted to the jury whether the murder charge was felony murder or, for lack of a better term, statutory murder. However, the State is not required to do so for a plea. Petitioner nonetheless knew from the initiation of the case that this was a felony murder. He pleaded guilty to murder and to the felony offense of robbery. That plea does not violate double jeopardy considerations.

7. "If a guilty plea is shown to have been intelligently and voluntarily entered into, generally it cannot be directly or collaterally attacked on double jeopardy grounds. One exception

---

[205] Other enumerated felonies omitted.

to this rule permits a defendant to show that the face of the record in the case establishes that a court lacked power to convict or sentence the defendant. "[206]

8. Although Petitioner has argued that the Circuit Court lacked jurisdiction because the transfer hearing was invalid, the Circuit Court had jurisdiction from the face of the record and as demonstrated in these proceedings. Therefore, Petitioner cannot directly or coUaterally attack his plea on double jeopardy grounds.

9. The Supreme Court held in *State v. Coles* that a double jeopardy claim can be waived. After examining the pertinent state and federal law, the Supreme Court came to the conclusion that a petitioner could not attack his convictions on double jeopardy grounds, but was limited to showing that the guilty plea was not entered into intelligently and voluntarily. The Supreme Court noted that the case of *United States v. Broce*[207] formulated a general rule that a claim of double jeopardy cannot be used to collaterally attack a guilty plea.[208]

10. Moreover, the State Supreme Court examined the plea in *Coles* in view of the general contract principles which govern plea agreements. Citing *State* v. *Proctor,*[209] the *Coles* decision notes that a plea agreement is subject to contract law to ensure that a defendant receives that to which he is reasonably entitled.[210] However, the State also has an enforceable "right" not to have the terms of the plea agreement breached.[211]

11. That decision makes it crystal clear that if an individual enters a voluntary, knowing, and intelligent guilty plea that bis convictions cannot be attacked on the grounds of double

[206] Sy!. Pt. 2, *State v. Coles.* 234 W. Va. 132, 763 S.E.2d 843 (2014).
[207] 488 U.S. 563, 109 S. Ct 757 (1989).
[208] *Coles,* 234 W. Va. at 135, 763 S.E.2d at 846.
[209] 227 W. Va. 352, 709 S.E.2d 549 (2011).
[21]° *Coles* at 137, 763 S.E.2d 843 at 848.
[211] *Jd.*

jeopardy. This Petitioner entered a voluntary. knowing, and intelligent guilty plea to murder and to robbery, and therefore cannot attack the guilty plea. This contention affords Petitioner no relief.

E. Trial Counsel was not ineffective. He did not fail to investigate the matter. He kept Petitioner informed and advised him of his rights. Petitioner's detention was not illegal; therefore, it was not ineffective assistance to challenge it. Trial Counsel did challenge the admissibility of the confession at the transfer hearing. The issue of the voluntariness of the confession in Circuit Court is waived by the entry of the plea. Counsel was not ineffective for failing to appeal the plea.

1. Petitioner asserts that trial counsel was ineffective. As noted above, the effectiveness of counsel is assessed under the *Strickland/Miller* standard through which the burden is placed upon Petitioner to demonstrate that his lawyer did, or failed to do, something no reasonably effective practitioner would have done (or not done) and that the error of omission or commission prejudiced Petitioner, negatively affecting the results of the proceeding. Failure to meet either prong of that standard is fatal to Petitioner's case.

2. Petitioner contends that trial counsel did not investigate his case based upon an analysis of the number of attorneys working at the Public Defender's Office, the number of cases each was assigned, and arriving at an average number of hours per case. Additionally, Petitioner contends that the length of time between the murder and plea was simply too short to perform an investigation. No evidence was proffered to support this contention.

3. Also, Petitioner did not produce evidence to show what should have been investigated and how that would have affected the result of the proceeding. Trial counsel had the case for roughly four months and participated in the transfer hearing. He had been provided complete discovery. He stated he had investigated the case and discussed with his client the State's case. Trial counsel testified that he never would have advised his client regarding the plea if he had not had sufficient time to investigate the case and prepare a defense, if one existed.

47

4. This case, while tragic, was not complicated factually. Witnesses heard the gunshot and saw the victim. Witnesses saw the car and identified it after Petitioner and his codefendant's fled. The driver of the car called 911 and made an inculpatory statement regarding Petitioner, as did the two female passengers. The codefendants confessed and signed plea agreements which included cooperating against Petitioner. Petitioner confessed. He told the police where he dropped the gun, and the police found a gun in that location. The victim died as a result of gunshot wound. Four months was adequate in terms of time to prepare for trial. Moreover, as stated above, Petitioner does not suggest what counsel should have been investigating and how that omission affected the result of the proceeding.

5. The calculations regarding average case load and average time per case ignore the reality that any lawyer will spend more time on a murder case than on a low-level misdemeanor. The calculations have no bearing on how much time trial counsel spent on the case, and there is no magic number of hours one needs to spend on a case to be prepared. Again, trial counsel represented to the Court that he had investigated the case. Petitioner alleges that not enough time was spent on the investigation, but again, fails to show what more should have been investigated and how that failure to investigate prejudiced his case. This contention affords Petitioner no relief.

6. Petitioner was adequately informed of his rights by his trial attorney. The guilty plea does not violate double jeopardy, and thus any advice to Petitioner that the plea did violate double jeopardy and should be rejected on that ground might well have been ineffective assistance of counsel. The lawyer did inform Petitioner of the nature of the crimes and the elements of those offenses. Petitioner acknowledged in the plea paperwork that he knew the elements of the crimes when he reread and signed the paperwork after the lawyer filled it in. The confession was not invalid, and the Tria] Court ruled it admissible. The transfer hearing was legally correct and the

48

Court had jurisdiction to either try Petitioner or allow him to plead. The Trial Court had jurisdiction. Explaining to Petitioner that the Court lacked jurisdiction would have been erroneous.

7. The plea does not violate double jeopardy, and therefore trial counsel could not have explained to his client it did. The Court had ruled the confession admissible; the lawyer could not have explained any purported invalidity or lack of jurisdiction.

8. Instead, it is clear from the plea paperwork that trial counsel explained, and Petitioner tmderstood, all rights he actually had and was waiving by pleading guilty. This contention affords Petitioner no relief.

9. Petitioner is correct when he notes that certain findings were not made in the detention order. Petitioner does not state how Petitioner's underlying criminal case was affected by the detention. In order for this contention to succeed in habeas, Petitioner bears the burden of showing how his defense was prejudicially affected by being detained. However, he does not even speculate as to legal harm. Additionally, the information which was not filled in does not in any way implicate a constitutional right. Further, complaints about detention are one of the non-jurisdictional defects waived by the entry of the plea.

10. Moreover, had the detention been challenged, only two outcomes were possible: the reviewing court would have noted that the failure to fill out the form was harmless enor under the circumstances of this case and upheld the detention, or the matter would have been remanded for another detention hearing. Petitioner was not escaping detention automatically if the detention had been challenged.

11. Although Petitioner was young, and apparently had not been in trouble before,[212] Petitioner committed a murder. He shot a young man for the basest of reasons, to steal his money.

12. Petitioner committed an offense for which bail, as an adult, is discretionary with the Court. Removal from the home was necessary because of the nature of the offense, the violence of the offense, the irresponsibility of the parent in lying regarding Petitioner's whereabouts, Petitioner fleeing the scene, Petitioner hiding from the police, and the safety of the community. Failure to make explicit findings did not void the order. If challenged and remanded, Petitioner would have remained in detention. Petitioner would have been detained until the conclusion of his criminal proceeding. No reasonably effective lawyer would have challenged the detentio and if challenged the result would have remained constant. Again, Petitioner fails to state how his criminal case was affected by being detained. This contention affords Petitioner no relief.

13. Petitioner errs when he states that being in custody automatically invalidated the confession. As noted above, a juvenile may indeed make a statement while in custody. In this case, prompt presentment was not violated. The Court examined the legal procedures followed by the police in obtaining the confessions and detemlined that all appropriate procedures were followed and the confession was admissible and voluntary for the purpose of the transfer hearing. Petitioner did challenge the statement; if by failing to challenge "adequately" Petitioner means that the challenge was unsuccessful that is not the standard of ineffective assistance of counsel. That is, success does not equate to effective representation and losing a motion does not equate to ineffective assistance, as the case law clearly holds that effective representation is not viewed in hindsight. The transfer Court ruled the statement admissible.

---

[212] Petitioner, at least, did not have a juvenile record, although reports presented to the Court regarding his stay in juvenile custody note that he had substantial difficulties at public school and a number of infractions at the detention centers.

50

14. Petitioner's counsel filed a motion in the Trial Court to suppress the statement. However, Petitioner pleaded guilty. Therefore, counsel's representation was effective by challenging the statement in juvenile Court and filing a motion in the Trial Court.

15. Counsel did what any reasonably effective defense attorney would do and moved to suppress the confession. Nevertheless, the statement was admitted over the objections of Petitioner, according to the order. Admissibility at trial was never addressed because Petitioner knowingly, voluntarily, and intelligently pled guilty. This contention affords Petitioner no relief.

16. It does not appear from the docket sheets in this matter that Petitioner ever requested the appointment of an attorney to file an appeal. Trial counsel's representation concluded when Petitioner was sentenced. In order to have the assistance of an attorney on appeal, Petitioner would have needed to request an attorney. It does not appear that he ever did. Indeed, Petitioner testified at the omnibus hearing that he did not request counsel to file an appeal

17. Moreover, the ground of lack of jurisdiction is not available to Petitioner either on appeal or in habeas as the transfer was legally valid and the Trial Court had jurisdiction over Petitioner's case. The confession was voluntary and not in violation of prompt presentment. The plea was v0Jw ltary and there was no coercion. Petitioner knew his rights and voluntarily waived them. The plea did not violate double jeopardy. This Court does not believe that Petitioner was under the influence when he pleaded, despite the attorney's plea hearing statement, because neither the Court nor trial counsel would not have permitted the plea to go forward with an incompetent defendant. Petitioner denied being under the influence in the paperwork he filled out immediately before pleading guilty. As noted, trial counsel testified at the omnibus hearing that his answer was a mistake and that unequivocally his client was not under the influence when he pied guilty.

18. Therefore, there were no viable grounds available to appeal the plea and an appeal would have been unavailing. Not only was an appeal never requested> but any appeal would have been futile. This contention affords Petitioner no relief.

**F. There** was **no prejudicial error and therefore no cumulative error.**

Finally, Petitioner asserts that the cumulative effect of trial counsel's errors and omissions resulted in ineffective assistance of counsel. Moreover, Petitioner argues that the Trial Court's alleged errors resulted in the proceedings being constitutionally defective. The doctrine of cumulative enor does not apply here. Where the record shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error.[213] The cumulative error doctrine is not applicable without legal and/or factual basis which support the individual assignments of error.[214] The cumulative error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors.[215] Because Petitioner fails to meet his burden of establishing that trial counsel erred in defending the action, and further fails to meet his burden of demonstrating that the Trial Court committed enor of a constitutional dimension, the doctrine of cumulative error does not apply. This contention affords Petitioner no relief.

The Court notes that Petitioner presented no evidence on the issue of severer sentence than expected or excessive sentence. Additionally, he presented no evidence regarding prejudicial statements by either the Court or the prosecutor. Moreover, no evidence was presented

---

[213] Syl. Pt. 14, *State* v. *Foster,* 221 W.Va. 629, 656 S.E. 2d 74 (2007).
[214] *See State v. Glaspell,* 2013 WL 3184918 (W.Va. June 24, 2013).
[215] *State v. Knuckles,* I96 W.Va. 416, 426, 473 S.E.2d 131, 141 (1996).

demonstrating Petitioner lacked competency at either trial or plea. Therefore, these assertions are deemed abandoned.

FINAL ORDER

Therefore, based upon a thorough and complete review of the complete co11tents of the criminal case file in this matter, the testimony at the omnibus evidentiary hearing, and the arguments of counsel for both Petitioner and the Respondent Warden both at the hearing and in written submissions, it is ORDERED that the *Petition for Writ of Habeas Corpus* be DENIED. It is further ORDERED that said civil action be DISMISSED and STRICKEN from the docket of this Court. The Court notes the exceptions and objections of Petitioner. It is further ORDERED that the Clerk of the Circuit Court of Kanawha County send certified copies of this *Final Order* to all counsel of record. Counsel will not be appointed automatically for the purpose of appealing this *Final Order*. If Petitioner wishes to have counsel appointed for the purpose of an appeal, he must file a motion with the Court requesting the appointment of counsel. Further, Petitioner is notified that the notice of appeal must be filed within thirty days of the entry of this order.

ENTERED this <u>>'1.y</u> of September 2019

x·1t/J
Louis H. Bloom



53